In the Matter of the Claim of LOUIS A. FERRARA et al., Appellants-Respondents. MARTIN P. CATHERWOOD, as Industrial Commissioner, Respondent-Appellant. NATIONAL AIRLINES, INC., Respondent-Appellant; HELMUT ETZBACH et al., Respondents-Appellants; WILLIAM TRIMBOLI et al., Respondents.

Third Department, July 12, 1960.

*Louis J. Lefkowitz, Attorney-General (Harold F. Lee, Paxton Blair* and *Samuel Stern* of counsel), for Industrial Commissioner, respondent-appellant.

*Vladeck & Elias (Stephen C. Vladeck, David L. Bernstein* and *Judith P. Vladeck* of counsel), for Louis A. Ferrara and another, appellants-respondents.

*Lester Rosenbaum* and *Parnell J. T. Callahan* for Helmut Etzbach and others, respondents-appellants.

*Herman I. Meltzer* for National Airlines, Inc., respondent-appellant.

*Mahlon Z. Eubank* for Commerce and Industry Association of New York, Inc., *amicus curiæ.*

*William Trimboli,* claimant-respondent in person.

*Nicholas Monteleone,* claimant-respondent in person.

*Andrew Perello, Jr.,* claimant-respondent in person.

BERGAN, P. J. The employer National Airlines, Inc., has its general offices in Miami; but it has a ticket office and hangar at Idlewild Airport and three ticket offices in Manhattan. Ticket agents, reservation clerks and baggage handlers employed at Idlewild and at the Manhattan offices are members of a union; airplane mechanics and cleaners employed at the Idlewild hangar are members of another union. For convenience we will refer to the first group collectively as " clerks ".

The contract between the employer and the clerks' union expired on April 1, 1957; negotiations were continued for a long period, and on September 18 and 19 a number of clerks employed in the Idlewild office discontinued work or failed to report for work. These stoppages were not authorized by the union.

Their duties were carried on by supervisory personnel and executives. The clerks in the Manhattan offices continued to work; some of the Idlewild clerks attempted to return to work in the afternoon of September 19, but were not allowed to do so by the employer.

The airline continued to operate, but between September 20 and September 22 clerks of the employer at Miami, Jacksonville, Tampa and New Orleans stopped work; and thereupon the employer discontinued all its operations and furloughed its clerks and hangar personnel.

The problem presented is whether the clerks at Idlewild, the clerks in the Manhattan offices and the mechanics and other hangar workers at Idlewild thus lost their employment within the terms of the statute so as to disqualify them for unemployment insurance benefits. A claimant is not entitled to benefits if he lost employment "because of" and "industrial controversy in the establishment in which he was employed" (Unemployment Insurance Law, § 592, subd. 1 [Labor Law art. 18]).

The appellant Industrial Commissioner ruled that all three groups fell within the terms of the statutory disqualification. On review the Unemployment Insurance Appeal Board has in part reversed the Commissioner's determination to hold that the Manhattan clerks are entitled to benefits, but that the Idlewild clerks and the hangar workers are not entitled to benefits. The Commissioner, the employer, and the claimants appeal respectively from adverse portions of this determination.

We are of opinion the Manhattan clerks did not lose their employment "because of" an industrial controversy "in the establishment in which" they were employed; and that the Appeal Board was right in its decision in this respect.

The word "establishment" is not refined in its statutory usage by contextual words. It seems certain, however, the Legislature did not mean by "establishment" the whole compass of a large employer's business institution where it operates in differently localized components. The word "establishment" has strong local connotations. In common use it often denotes a store or mercantile place of business.

An industry with many local units may have many "establishments" within the statutory language as we read it. An industrial controversy in one such localized place, affecting employment in another localized place in such an industry is not in the same establishment. (*Matter of Machcinski* [*Ford Motor Co.*], 277 App. Div. 634.)

This emphasis on location as having important relationship to the term "establishment" was further developed in *Matter of Lasher (Bethlehem Steel Co.)* (279 App. Div. 505) for there the industrial controversy existed in a different division of the employer's business, the fabrication of steel, than that in which the claimant was engaged, the erection of steel buildings. It happened that the employer was erecting an addition to its own fabricating plant, but because the claimant would not cross the picket line at that plant he was held ineligible for benefits.

Thus it is to be seen that both *Machcinski* and *Lasher,* reaching different results, converge on the controlling nature of the localized site of controversy and of resulting unemployment. *Matter of Wentworth (Catherwood)* (10 A D 2d 504), represents another aspect of an essentially similar problem.

It will be assumed that the unemployment of the Manhattan clerks arose because of the work stoppage of the Idlewild clerks; because this work stoppage on September 18 and 19 led consequently and quickly to the further work stoppages in southern cities and to the termination of the employer's operations.

Although clerks in both places were members of the same union, the Manhattan clerks continued to work and, as we have seen, the proof is that the union did not call a strike or direct the Idlewild clerks to discontinue work. (*Matter of Wittlaufer [Ferguson Elec. Constr. Co.]*, 277 App. Div. 805.)

An airline is an integrated operation with interdependent units; but so was the motorcar company in *Machcinski.* Miami and Idlewild and Manhattan are close together in the business of communicating airline reservations; but they are different geographic work locations; and time and space between them are matters of degree. Manhattan and Idlewild are, in our view of the case sufficiently different not to be treated as the same "establishment".

Nor is the hangar at Idlewild, which in a large airport has relatively large spatial separation from the ticket offices in the same establishment either in the identity of workplace or in the nature of the activity of the employees who there lost employment following the controversy which began in the ticket offices and spread to other offices. (Cf. *Matter of Wittlaufer, supra.*)

The loss of employment by the Idlewild clerks themselves was the result of a controversy which began directly in the establishment in which they worked and burgeoned out elsewhere and the Commissioner and Appeal Board are right in their ruling of disqualification of these workers.

The determination of the Unemployment Insurance Appeal Board should be affirmed in respect of the Idlewild and Man-

hattan clerks; and reversed in respect of the Idlewild hangar employees, without costs, and the orders to be entered should be settled on notice.

HERLIHY, J. (dissenting in part). I agree that the Idlewild clerks are governed by subdivision 1 of section 592 of the Labor Law and not entitled to unemployment benefits.

As to the mechanics employed at Idlewild, I vote with the majority that they are entitled to benefits. I am not at all certain that the distinction as to establishment as applied here to the mechanics was the intendment of the Legislature but, at least, this segment of the airlines' employees can reasonably be distinguished as they were in no way associated with the employees or their union which engaged in the work stoppage and precipitated the industrial controversy.

In my opinion the Manhattan clerks are not entitled to benefits. These clerks all belonged to the same union, they intermingled between the two locations — Manhattan and Idlewild — and whether it be classified as "wildcat" or otherwise, the clerks at Idlewild started the industrial controversy that eventually resulted in closing down the operations of the airlines resulting in financial loss to it as well as its employees. Under such circumstances, whether the Manhattan clerks helped promulgate the strike is immaterial. Their union was attempting to negotiate a new contract and they would be among the beneficiaries. Therefore, they should share the same financial burden as the Idlewild clerks.

The situation here is somewhat analogous to the factual events in *Matter of Sprague (Lubin)* (4 A D 2d 911) which involved a controversy at the Plattsburgh Air Base. The Referee found the *work stoppage* was caused "'in order to exert pressure through the contractors and subcontractors on the Air Force to accede to demands made by several of the allied unions' and this he found to be industrial controversy. The evidence would sustain a finding that the procedure adopted by the unions was to exert pressure on the Air Force to reinstate the contract terminated or make a new contract for the employment of union labor. The board in effect reversed the referee, holding that no industrial controversy existed, on the ground that the dispute was between the unions and the Air Force and not between the unions and the contractors, who were the employers." In sustaining the Referee, this court said: "While it may be said, at least technically, that no lockout or strike existed, certainly an industrial controversy existed. The language of the statute in that respect is very broad and there is no indication in its legislative history or otherwise that the Legislature intended

to limit such language as narrowly as the board in this case has construed it."

The emphasis under section 592 of the Labor Law should be directed toward the industrial controversy and its causes and not toward pecuniary punishment of a faultless employee. Preoccupation with the word "establishment" will tend to distort both the express policy of the Unemployment Insurance Law of benefiting those who lose their employment through no fault of their own (§ 501) and the underlying policy of section 592 of precluding employees from utilizing unemployment insurance as a means of financing an industrial controversy. (*Matter of Burger* [*Corsi*], 277 App. Div. 234, 236.)

This court has recently stated that section 592 "should be strictly applied to those involved in the strike and to those who are directly or indirectly aiding and abetting its continuance". (*Matter of Wentworth* [*Catherwood*], 10 A D 2d 504, 506.)

The majority opinion in the present case tacitly recognizes that the Manhattan clerks would not be entitled to immediate benefits if the union had directed the Idlewild clerks to discontinue work. Section 592 is not solely contingent on a union directive. If this were true, the statute could be circumvented by the mere "happening" of an "unannounced", "unexplained" work stoppage at any place of employment. It appears to be undisputed that in the present case, the calling of a general strike by the union was prohibited by the Railway Labor Act (U. S. Code, tit. 45, § 151 *et seq.*).

*Matter of Wittlaufer* (*Ferguson Elec. Constr. Co.*) (277 App. Div. 805) cited by the majority, is not controlling as to the clerks herein who were members of the same union. There were several unions involved in that case and it is more in context with the facts as applied to the mechanics in the present case.

Where, as here, union negotiations extended over a prolonged period of time and the negotiating union purports to control its members, an industrial controversy which is precipitated by the direct action of a significant number of union members must be realistically held to involve similar members closely aligned, geographically and economically, to the controversy.

In my opinion, *Matter of Machcinski* (*Ford Motor Co.*) (277 App. Div. 634) is not applicable to the present facts. In *Machcinski*, a local union located at River Rouge, State of Michigan, had grievance difficulties in its plant. The local was unable to solve its problems and called in the international which likewise was unsuccessful in its negotiations. Thereafter the local voted to strike, which action was approved by the international union although no general strike was authorized. The

New York State division of Ford Motors, located at Buffalo and Green Island, took no part in the strike or the settlement of the grievance claimed at River Rouge. It is apparent that the industrial controversy was strictly a local affair at River Rouge and the word "establishment", as used in section 592 of the New York State Labor Law, was never intended to be controlled or defined by such circumstances. The opinion in *Machcinski* is a comprehensive discussion of the intent and purpose of the law but as a precedent it should be confined to its own peculiar facts and circumstances.

Here, the work stoppage which caused the closing of all of the employer's operations was initially formulated in New York State. If it had originated at Miami or some other out-of-State location through no fault of the New York State employees, it would, at least, be more analogous to *Machcinski*.

The industrial controversy which ultimately resulted in the closing of the airlines was initiated by the Idlewild clerks, and the closely associated and intermingling clerks from Manhattan, members of the same union, are not entitled to immediate benefits. The determination in that respect should be reversed.

Coon, Gibson and Reynolds, JJ., concur with Bergan, P. J.; Herlihy, J., dissents, in part, in a memorandum.

Determination of the Unemployment Insurance Appeal Board affirmed in respect of the Idlewild and Manhattan clerks; and reversed in respect of the Idlewild hangar employees, without costs.

Settle order on notice.